23968. ELLISON *v.* THE STATE.

DECIDED OCTOBER 29, 1934.

*Grover C. Anderson,* for plaintiff in error.
*George Hains, solicitor-general, John M. Graham,* contra.

MACINTYRE, J. K. C. Ellison was charged with murdering Man Mobley "by shooting him in the body with a pistol." A jury found

the defendant guilty of voluntary manslaughter, and the question for determination is whether or not the trial judge erred in over-ruling the motion for a new trial, containing the usual general grounds and five special grounds.

George Young, sworn for the State, testified in part: "It was at night, at Stoney Gillard's house at a party. Some time about ten o'clock K. C. Ellison came there in a Chevrolet car. When he stopped the car where this man was, he jumped out with a pistol in his hand and said: 'What S. O. B. want me some?'" Man Mobley said: "'You are another S. O. B.' And when he said that, Man Mobley grabbed the pistol. I run between' them and caught across his hand like that and told Man to turn loose, and he dropped his hand loose, and I told Man: 'You go ahead and don't bother K. C.' And I told K. C.: 'Go ahead and don't bother Man.' He allowed he was going to kill some S. O. B. here to-night. Man didn't say anything. I walked behind Man Mobley toward the porch, and I said: 'Man, don't bother that boy.' He said: 'I am done with him.' . . I separated them at first, but when the shooting took place I had gone. The time Man grabbed the pistol, I don't know whether he intended to take it or not."

The testimony of Bob Dixon, sworn for the State, is substantially the same as that of the witness George Young, except that Dixon swore: "I have known Man Mobley all my life. . . I have heard of him taking people's pistols, but I never heard of his shooting at them. Somebody told me that he had tried to shoot at him. I do not know his general reputation for taking people's pistols from them and shooting at them. I ain't never known Man to do anything around a place like that unless he seen a fellow come up with a pistol in his hand: ' he is pretty nervous and tried to take them away from them." J. C. Cooper, sworn for the State, testi-fied in part as follows: "Man Mobley got killed with a pistol. The bullet hit him in the stomach. . . Man walked toward K. C. Ellison, and he backed off and pulled out a gun and told him not to come on him. K. C. said that. When he pulled out the gun, me and James Heath ran into K. C. Ellison to take his gun. He had it out in his hand; he didn't say what he was going to do with it—just backed off and snatched it out, and told him not to come on him. Heath and I ran into him to take his gun. We got it out of his hand, and James Heath had it. . . K. C.

asked for it back, and James Heath gave it back to him . . and K. C. Ellison shot Man Mobley. At the time that he shot Man Mobley, Man had stopped walking up on him then. Man was standing up there with his hands in his pocket. He wasn't doing nothing to K. C. Ellison then. K. C. Ellison shot him in the stomach. . . He died on Monday, and that was Saturday night. . . There were two shots fired. Man Mobley was hit only one time. . . And Man kept walking on him until he pulled out his gun, and he stopped. K. C. pulled out his gun and shot one shot in the ground. . . I have heard of him (Mobley) taking pistols, but I never heard of him shooting at anybody." After testifying substantially as did the other witnesses in regard to the first meeting of the defendant and the deceased, Jesse Thorpe, sworn for the State, testified in part as follows: "I don't know what kind of an argument, nor how they started, but know that they just started again. And K. C. Ellison walked off from Man Mobley then, and Man started up on him, and he shot. The first time he missed him, and the second time he hit him. . . At the time Man was shot, he didn't have nothing. He didn't have anything in his hands. No, sir, no knife, no pistol, nothing at all. He was an unarmed man, and this fellow shot him down. . . He (Mobley) left the crowd and went up to K. C. Ellison. Then K. C. backed off, and backed up to the wire fence, and told Man not to come on him . . but Man kept going. K. C. shot one time in the ground. Man Mobley stopped then. There wasn't much difference in the time of the firing of the two shots. I did not see any liquor there that night nor see any of them drinking. After Man was shot, he fastened K. C. and crumpled down his knees right there as K. C. Ellison backed right up there against the fence."

After testifying about the first meeting of the defendant and the deceased, Jules Jackson, sworn for the defendant, testified in part: "He walks off, and after a while he come back, and pulled off his hat. He said: 'If any of you don't like what I said and what I done, here I is; I am a man like anybody else.' And that time he walked up there again, and he said: 'You heard what I said.' Nobody didn't give him an answer. He walks off and comes back with his hands in his pocket, and that boy K. C. Ellison gets out of his way, and he walked up to him again, and he told him to 'get back, Man.' And he said: 'I will make you shoot

that little popgun you have around here.' He said: 'Get back, Man, don't come on up on me.' There was a wire fence, and he backed up against the wire fence, and he shot, and Man Mobley kept walking on up, and he shot him. . . . I couldn't swear that he had taken people's pistols and shot at them, but heard lots of people say of his taking people's pistols and shot at them after he taken it away from them. . . And K. C. had the only gun that I seen that night. . . After he was shot he didn't pull out a gun, but he tried to take it—tried to take the man's gun that was shooting at him. And that was what he was trying to do when he got shot." George Robinson, sworn for the defendant, gave testimony which adds nothing that is material to that of Jules Jackson. Mamie Heath, sworn for the defendant, testified in substance that Man Mobley was drinking; that when the defendant came up on the side of the automobile, Howard Ellison offered him a drink, and the defendant said that he had quit drinking; that Mobley said: "Don't you believe that S. O. B.;" that K. C. said: "I don't handle that;" that "Man grabbed K. C. and tried to take his gun from him," and George Young parted them; that then "Man came back to K. C. again in the crowd where he was standing" and asked: "What S. O. B. want him some;" that Man came back to K. C. again and repeated his question; that Man then walked back to Jesse Thorpe, and said to him: "Jesse, give me that pistol;" that Howard Ellison, referring to K. C. Ellison's pistol, said: "I done told you there wasn't nothing in that pistol;" that Man Mobley then asked Jesse for the pistol again, and Jesse gave it to him, and "he put it in his left-hand breast pocket and commenced walking towards K. C. Ellison; that "K. C. didn't do anything;" that "Man walked on his feet," and K. C. told him there was plenty of room without walking on his feet; that then J. C. Cooper said: "Do what you damn please, Man; say what you please; I will back you;" that Rogers Mobley said the same thing; that Rogers was Mobley's uncle; that Mobley "then went on this boy;" that the defendant then "backed back and told him to get back off of him," and "he wouldn't get back, and he backed into a wire fence," still telling Mobley "to get back off of him, and he wouldn't get back off of him, and so he shot;" that J. C. Cooper, Howard Ellison, Rogers Mobley, Jeff Hilton, and Jesse Thorpe had him ganged there in the wire fence—all of them were

around him. . . · After the last shot was fired, Man didn't do anything but grab K. C. Ellison; that Mobley was left-handed; that Jesse Thorpe took the pistol out of Man Mobley's pocket; that, so far as she knew, Mobley never pulled the pistol out of his pocket; and that when Mobley was shot he grabbed the defendant. Arthur Hilton, sworn for the defendant, testified that he never knew of Mobley's taking anybody's pistol and shooting at him—that he had "heard folks talk it," but that so far as he knew Mobley was "all right." Fonzie Dixon, sworn for the defendant, testified that he knew of Man Mobley's reputation for "taking people's pistols and then shooting at them," but that he had only known him to take one.

After substantially stating to the jury that Mobley and his companions came up with half a gallon of whisky and offered the defendant a drink, that when the defendant refused to drink, Mobley cursed him vilely, said he was telling a lie when he said he had quit drinking, and threatened to take the pistol the defendant had in his belt; that both the defendant and Mobley grabbed the pistol; that at the suggestion of George Young, Mobley turned the pistol loose; that Mobley walked off, and the defendant put the pistol in his belt; that Mobley then "walked on" the defendant's feet, and the defendant requested him to stop; that Mobley then got a pistol from Thorpe, and said, "I am ready for anything that starts;" and that then "J. C. Cooper walked up with his hand in his bosom and said, "Go ahead, we are with you," the defendant's statement continues: "I didn't know what he was going to draw, and Man said: 'I am going to take that pistol.' I kept backing back, and he comes on, with his hands in his pocket. I said: 'Man, get back;' and I shot and he didn't shoot. When he come ahead with his left hand in his pocket, I went to shoot him in this hand. I didn't try to kill him. . . I have known him to take three people's pistols—Hilton's pistol down there, and shot him, and Ham Young's pistol, and shot at him. . . They locked him up in jail at Christmas and he broke out of it."

A. B. Daniel, sworn for the State, testified that Mobley had been working for him for two years; that he knew nothing about his taking pistols from people and shooting at them; that he understood that the defendant stayed around at Mamie Heath's a good deal; and that Mobley had "a good reputation as far as shooting at anybody."

In special ground 1 it is insisted that the court erred in refusing to give the jury the following requested charge: "Robbery is the wrongful, fraudulent, and violent taking of money, goods, or chattels from the person of another by force or intimidation, without the consent of the owner." This charge is in the language of the first part of section 148 of the Penal Code of 1910. We think that the facts and circumstances of the case fail to show that the deceased had any intent to steal the defendant's pistol, and "there can be no robbery without intent to steal." *Sledge* v. *State*, 99 *Ga.* 684 (2), 685. (26 S. E. 756). We therefore hold that the court properly refused to give the requested charge.

In the second special ground it is averred that the court erred in refusing to give the jury the following requested charge: "I charge you, gentlemen of the jury, that robbery is a felony." Robbery not being in the case, the court did not err in refusing to give the requested charge.

Special ground 3 avers that the court erred in charging the jury as follows: "Provocation by words, threats, menaces or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder." This is a part of the definition of voluntary manslaughter in section 65 of the Penal Code (1910), and "surely it can not be said that it is error to define manslaughter in the words of the statute." *Price* v. *State*, 137 *Ga.* 71 (7), 74 (72 S. E. 908). See also *Deal* v. *State*, 145 *Ga.* 33 (88 S. E. 573), which is to the same effect, and in which it is held that "instructions on the law of voluntary manslaughter and justifiable homicide should be independent of each other." "If the defendants desired a charge to the effect that evidence of threats and menaces might be considered in connection with other evidence bearing on the subject of reasonable fears, they should have made a proper request therefor, if the facts warranted the giving of it." *Futch* v. *State*, 137 *Ga.* 75 (2-a) (72 S. E. 911). In another part of his instructions the judge charged the jury, "If you believe when he killed him he did it under the fears of a reasonable man that some bodily harm was about to be done him, amounting to a felony, and he really acted under the influence of those fears, and not in the spirit of revenge, he would be justifiable, and *a seeming necessity, when acted on in good faith, is equivalent to a real necessity.*" (Italics ours.) Under the foregoing authorities, we hold that this ground discloses no reversible error for any reason assigned.

In special ground 4 it is contended that the court erred in giving the jury a charge which begins as follows: "The defense set up is that of self-defense, and that of the fears of a reasonable man. I charge you if you believe the defendant killed the deceased in his own self-defense to save his own life, then he is not guilty, or;" continuing and ending in the precise language quoted in the preceding ground. This charge is not erroneous for the reason that it "withheld from the jury the consideration of one of the main defenses, that is, the killing was done for the purpose of preventing the deceased from robbing the accused of his pistol and then turning on him," or because it "withheld from the consideration of the jury the theory that the defendant could justifiably shoot, and even take human life, to prevent the taking of his property from his person." The charge given by the court follows closely the law of justifiable homicide as laid down in the Penal Code (1910), §§ 70 and 71, and there is no error in it for any reason assigned.

We quote from special ground 5: "The court erred in failing to charge the jury the law of mutual combat, that is, if the slayer has not begun the fight, or endeavors to decline any further struggle, or afterwards, being closely pressed by his antagonist, kills him to avoid a felony being committed on him, is excusable homicide." We quote further from the ground: "The failure of the court to charge that principle of law of mutual combat withdrew from the jury the consideration of after a man remonstrates with a person to leave him alone and the deceased continues to press on, with the avowed purpose of taking his personal property from his person, that he would have a right to prevent the taking of said personal property, even to the taking of human life." We do not understand it to be the law that under the Penal Code (1910), § 73, a person is justified in slaying his antagonist "to avoid a felony being committed on him." Under that section, "it must appear that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary." "Nor is it true, as a matter of law, that in cases of mutual combat it is justifiable homicide for one, who voluntarily enters into a fight with another, to kill his antagonist to prevent any other felony than the taking of the life of the slayer." *Dill* v. *State,* 106 *Ga.* 683, 687 (32 S. E. 660). Sections 70 and 73 of the Penal Code of 1910 present entirely distinct defenses, which

must not be confused or intermingled, the wide difference in these defenses being predicated upon the fact that in the one case the defendant is without fault, while in the other he is at fault. This difference is clearly stated in *Dill* v. *State,* supra. See also *Powell* v. *State,* 101 *Ga.* 9, 22 (29 S. E. 309, 65 Am. St. R. 277). To have charged the jury that under section 73 of the Penal Code, the defendant would be justified in slaying the deceased "to avoid a felony being committed on him," would have been error. In short, it appears that the plaintiff in error complains that the court failed to give a charge that would have been contrary to law and highly improper. In *Whitaker* v. *State,* 34 *Ga. App.* 175 (2) (128 S. E. 585), this court held: "The court having fully instructed the jury upon the law of justifiable homicide, it was not error (especially in the absence of a timely and appropriate written request) to fail to give in charge section 73 of the Penal Code." The ground under consideration discloses no reversible error.

The evidence supports the verdict; none of the special grounds of the motion for a new trial discloses reversible error; and the court did not err in overruling the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*